# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.　　　　　　　　　　　　　　　　　　　　　　Case No. 05-CV-486

WILL J. SHERARD, and
W.J. SHERARD REALTY COMPANY,

        Defendant.

## ORDER

Before the court is the January 13, 2011 Motion to Clarify Mandate (Docket #103) filed by defendants Will J. Sherard and W.J. Sherard Realty Company (collectively, "Sherard"). Come May of this year, this case will have been before this court for six years. Sherard entered the Consent Decree (Docket #6) at the heart of this case on August 3, 2005, nearly five and a half years ago. In those nearly five and a half years, Sherard has been highly active, engaging the resources of this court by filing or forcing the government to file: a Motion to Enforce Consent Decree (Docket #7), two motions for contempt (Docket #'s 21, 31), two motions for extension of time to comply with the Consent Decree (Docket #'s 15, 28), a Motion to Vacate or Modify Consent Decree (Docket #29), a Motion to Compel Financial Disclosure (Docket #33), Objection to Financial Disclosure (Docket #38), a Motion to Dismiss Order for Financial Disclosure (Docket #39), a Motion to Establish an Escrow (Docket #49), a Motion to Enforce Contempt Order (Docket #50), a Stipulation to

Administer Abatement Work Required (Docket #56), a Motion for Preliminary Injunction Pending Motion to Modify Consent Decree (Docket #58), a letter from Sherard requesting removal of the government attorney (Docket #66), a Motion to Expedite Escrow Funds (Docket #70), a Motion for Reconsideration (Docket #80), an appeal of the reconsideration denial (Docket #83), a Petition for Rehearing and Petition for Rehearing En Banc after affirmance by the Seventh Circuit (7th Cir. Case No. 10-3056, Docket #12), a Motion for Stay Pending Writ of Certiorari to the U.S. Supreme Court (*Id.*, Docket #14), a Motion to Vacate Issuance of Mandate (*Id.*, Docket #16), a letter requesting a date-certain for deposit of escrow funds after the Seventh Circuit affirmed (Docket #97), an Objection to that request (Docket #98), and five hearings on various previously noted motions (Docket #'s 17, 30, 44, 47, 67). Despite all of this activity, what is the one thing Sherard has not acted upon? Completing the abatement of lead-based paint hazards in the thirty-nine residential properties he owns.

The August 3, 2005 Consent Decree provided that Sherard would perform risk assessments on each of thirty-nine properties, followed by hazard abatement and window replacement. (Consent Decree ¶¶ 5m, 14-19 & App. A). Following ten motions and other filings over the course of nearly four years, the parties filed a stipulation on July 2, 2009, governing how the parties would proceed with abatement of the remaining properties. (Stipulation to Administer). Prior to the stipulation, over the course of *four years*, Sherard completed abatement on *only two* of his thirty-nine

properties. (Stipulation to Administer ¶¶ 2-3). That is, it took Sherard nearly four years to complete roughly *five percent* of the abatement which he was bound to complete by his entry into the Consent Decree. As of February 1, 2010, abatement on a further three properties had been completed according to the government. (Letter from Stacy Gerber Ward) (Docket #63). Even if further abatement has occurred in the past year, at most, 11 properties may have been abated. (*See* Stipulation to Administer ¶ 3a) (first phase of abatement for remaining thirty-seven properties includes nine properties). Thus, at best, Sherard has proceeded with abatement at an average rate of roughly one property every six months. At that rate, Sherard would be set to satisfy his obligation under the Consent Decree in *fourteen years*. That is clearly unacceptable.

Sherard's latest pro se motion states that it is brought pursuant to Article 1, Section 9 of the Wisconsin Constitution, the Fifth Amendment of the U.S. Constitution, and Rule 41 of the Federal Rules of Civil Procedure. (Mot. to Clarify 1). These sources of law are inapplicable,[1] and, in any event, the substance of his arguments fail. As best as the court can discern, the "clarification" that Sherard requests is: a reevaluation of the amount to be escrowed; a cap on potential

---

[1] Rule 41 relates to the dismissal of actions, and the court does not understand the connection between the cited rule and Sherard's complaints. As to the Wisconsin Constitution, that section is a general provision for the remedy of wrongs, entitling persons to obtain justice freely. Perhaps Sherard invokes this provision with his comment that "[i]n any event, the Court has declined to grant any of the Defendant's motions, summarily sweeping them under a rug." But primarily it sounds as though Sherard simply has trouble accepting the fact that he finds himself in a losing battle with regard to his conduct. Were this metaphorical rug to exist, the court would not be surprised to find all of its orders similarly swept under by Sherard, who, by his actions, gives every appearance of having no regard for the authority of these directives.

payments per property; "coordination" between City of Milwaukee agencies; and a provision for the return of any unused escrow funds. Sherard also raises an issue as to alleged negligence and "substandard work" of the City of Milwaukee's chosen abatement contractors. He also requests a hearing on this matter.

None of these complaints are germane to the issue at hand, that is, escrow of funds necessary to perform the agreed-upon abatement work. The order for escrow concerned itself only with providing the funds estimated as necessary to complete abatement for the remaining properties. Sherard makes five specific arguments: (1) not all nine properties were repaired during the first phase under the stipulation and, in fact, two have been placarded, thus, the calculation of the amount to escrow is not accurate and should be recalculated; (2) the first-phase properties were in worse condition than remaining properties, thus, the costs for the remaining properties should be less and the escrow amount is therefore not accurate; (3) there is no cap set on the amount that may be spent on repair of an individual property as against its market value; (4) there is no mandated coordination between City of Milwaukee agencies; and (5) there is no provision in the court's order for return of unused escrow funds.

In response to Sherard's first argument, to be sure, the $700,000 sum is necessarily an estimate, and though he urges a recalculation "based on facts, circumstances and actual conditions rather than educated guess-work," there is no way to come to a completely accurate number unless Sherard proposes to abandon

the four-phased process agreed to by stipulation and instead perform all the abatements immediately. But the court has no reason to believe that to be Sherard's intent. Rather, on the basis of his conduct over these unnecessarily prolonged proceedings, it is abundantly clear to the court this argument is simply another tactic of delay. It is irrelevant that at least two properties used in creating the estimate have been placarded. The Consent Agreement binds Sherard to an obligation to pay for abatement. There is no escape clause conditioning payment for work on the continued operation of any given property and, therefore, using the cost to abate a placarded property, regardless of whether abatement actually occurs, is an entirely appropriate step in developing an estimate.

Second, it is similarly irrelevant that the properties in phase one were allegedly in worse condition than those in the later phases. Because Sherard has refused to comply with his obligations up to this point without judicial pulling of teeth, the court ordered that he escrow funds sufficient to pay for all abatements. The purpose is to guarantee the existence of the funds and allow the government to proceed without any further interruption in completing the work agreed to in the Consent Decree. In order to reach an appropriate sum, an estimate is necessarily required, and the abatement costs of phase-one properties are an entirely reasonable method of developing an estimate. And in any event, Sherard offers no evidence of why the

later-phase properties will cost less.² The court finds no reason to conclude that, as stated earlier, this motion is anything other than a further attempt to delay.

As to Sherard's third argument, setting some type of cap or providing other relief on the basis of individual properties, is also not germane to the court's order. The Consent Decree, which establishes the underlying obligation, provides simply for Sherard's payment of abatement costs. The fact that his properties may not be worth abating when compared to their overall value, or that the city may simply tear them down for other violations after the abatement occurs, does not change Sherard's obligation to do what he legally bound himself to do. If the properties were not worth saving, then perhaps he should have considered that before entering the Consent Decree. And to offer his state of surprise at the unexpected cost after the fact is of no legal significance. The purpose of the Consent Decree was to provide Sherard the benefit of avoiding a substantial amount of civil penalties in return for making his buildings safe for families to live in. It is not the government, nor this court's fault that some of Sherard's buildings may be additionally unsuitable for habitation because of further violations that he too is responsible for failing to fix. Sherard attempts to portray himself as a victim, but the real victims are the low-income families forced to live in buildings where the landlord cannot be bothered to provide safe living conditions. Sherard's conduct in this drawn-out case has displayed that not only does he seem to lack respect for human beings, and the

---

²Sherard's request for a hearing and offer of evidence in this motion relates only to supposed documentation of negligent work completed by abatement contractors.

moral and ethical duties we hold toward each other, but he also seems to lack respect for his legal obligations to enforce those morals and ethics. False cries for help fall on deaf ears when shouted by those who profit on the backs of others with little or nothing. Sherard's argument that the court should relieve him of his duty because he has failed to carry out his other responsibilities holds no water. In total, Sherard essentially asks the court to modify the underlying Consent Decree, which the court has repeatedly declined to do. He presents no more of a persuasive case this time than all those prior.

Next, Sherard's fourth contention is essentially an extension of his third, and therefore similarly disposed of. In complaining of a lack of mandated coordination between city agencies, Sherard is once again pressing his argument that he should not have to spend funds on properties that may remain uninhabitable, or be torn down for other reasons. This argument has long since been disposed of. However, Sherard additionally asserts that some properties have received code violations for certain needed repairs that he alleges were paid for, corrected, and approved by the city during abatement, yet are now the subject of violation. Once again, that issue is not germane to the order to escrow funds at hand. The point of escrowing funds is to accomplish the agreed-upon abatement. If that money is spent on abatement work, and approved as having been satisfactorily completed, then Sherard need not spend any more money on abatement for that property under the Consent Decree. That the City of Milwaukee might find some other violation linked to work done by its

own abatement contractors is an issue to take up with the city. It has no bearing on Sherard's obligations under the Consent Decree. To the extent he is unsatisfied with past abatement work, that issue is not implicated by the court's order to fund *future* abatement.

Finally, Sherard raises a colorable point regarding return of unused escrow funds. It might be true that were all abatement work completed and leftover funds not returned to Sherard, he might have an action under the Takings Clause. However, that case is not yet ripe and, in any event, Sherard may address the issue of unused funds upon completion of all work required under the Consent Decree. As the government points out, the stipulation governing the process of abatement provides that "any money remaining in the escrow account after completion of the work under the Consent Decree and this agreement shall be returned to the Defendants upon further order of this court." (Stipulation to Administer ¶ 9). If there remain unused funds, which the government refuses to return, the court would invite Sherard to file a motion seeking return or some other form of relief. Until that point, however, the court finds it unnecessary to modify its earlier order. Thus, in total, the court finds no significant reason provided in any of Sherard's arguments to "clarify" or otherwise modify its previous order to escrow the required funds.

As for Sherard's request for a hearing on the basis of the irrelevance of his complaints against the entire record in this case, the court finds no factual or legal basis to conduct a hearing and, therefore, that request will be denied.

Accordingly,

**IT IS ORDERED** that the defendant's Motion to Clarify Mandate (Docket #103) be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that the defendants Will J. Sherard and W.J. Sherard Realty Company will **DEPOSIT $700,000.00** in the designated escrow account with Mayfair Title forthwith or be subject to contempt of court upon motion of the United States.

Dated at Milwaukee, Wisconsin, this 21st day of January, 2011.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge