# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                                      Plaintiff,<br><br>v.<br><br>WILL J. SHERARD and<br>W.J. SHERARD REALTY COMPANY,<br><br>                                     Defendants. | Case No. 05-CV-486-JPS<br><br><br><br>ORDER |

    1.     BACKGROUND

In 2005, the parties entered into a consent decree ("Consent Decree") to address the defendants' alleged violations of Section 1018 of the Residential Lead-Based Paint Hazard Reduction Act of 1992, 42 U.S.C. § 4852d, regarding thirty-nine (39) residential properties ("the Properties") in the City of Milwaukee ("the City") owned and managed by the defendants. (Docket #6). The Consent Decree required, *inter alia*, certain abatement of lead-based paint at the Properties. *Id.* Just shy of ten years later, this case remains on the docket; but, the long slog of this case is nearly over.[1]

On November 7, 2014, the Court ordered the parties "to fully brief the remaining issues in the case and, more importantly, each party's proposed method of bringing this matter to its well deserved end." (Docket #191 at 4). The parties did so (*see* Docket #192, #193, #194, #195), and thus on December 30, 2014, the remaining issues in this case became ripe for adjudication.

According to the government, there are three remaining issues in this case: (1) the absence of a ruling on the government's motion for contempt,

---

[1]The Court presumes the reader's familiarity with the history of this case; accordingly, the Court will forego recounting the posture of the case and will instead address certain historical facts when necessary to resolve the issues at hand.

filed on December 27, 2012 (*see* Docket #143); (2) deficiencies in the defendants' third-party clearance exams; and (3) the unmet requirement that the defendant file a certification in compliance with Paragraph 58 of the Consent Decree as a pre-condition to release of the remaining funds in escrow. (Docket #192 at 1-2). The government proposes either that the Court rule on its motion for contempt, or, the government will withdraw its motion for contempt and stipulate to the release of funds from escrow and termination of the Consent Decree if the defendants: (1) "implement an [ongoing operations and maintenance ("O&M")] plan substantially similar to the O&M plan attached [to the government's brief]," and (2) "agree to give HUD future access to [two properties abated outside of the Consent Decree] to visually inspect for lead-based paint hazards." *Id.* at 2-3.

      The defendants argue that the three remaining issues identified by the government are "with the court and not with the defendants." (Docket #193 at 1). This is so because, "[t]he goal of having each of the properties remediated has been completed" and the defendants have paid the entire cost to do so. *Id.* at 4. Thus, the defendants' request "that the United States' motion for contempt [be] dismissed, [t]he Consent Decree be vacated in its entirety, and the remaining funds be released to the defendants forthwith." *Id.* In the defendants' view, changed circumstances and substantial completion of the Consent Decree militate against a finding of contempt. And, according to the defendants, those same reasons compel them to reject the government's "olive branch"—the government's offer to withdraw the motion for contempt if the defendants agree to an O&M plan and give HUD future access to two properties.

The Court will deny the government's motion for contempt and also deny the defendants' request to vacate the Consent Decree, for the reasons that follow.

2. DISCUSSION

    2.1    The Government's Motion for Civil Contempt

        2.1.1   Legal Standard

"Consent decrees are a hybrid in the sense that they are at one both contracts and orders; they are construed largely as contracts, but are enforced as orders." *Berger v. Heckler*, 771 F.3d 1556, 1567-68 (2d Cir. 1985) (internal citation omitted); *see also Cook v. City of Chicago*, 192 F.3d 693, 695 (7th Cir. 1999) ("From the standpoint of interpretation a consent decree is a contract, but from the standpoint of remedy it is an equitable decree."); *Gates v. Shinn*, 98 F.3d 463, 468 (9th Cir. 1996) ("A consent decree is…'in some respects contractual in nature,' but the equitable decree based on the agreement [of the parties] 'is subject to the rules generally applicable to other judgments and decrees.'") (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992)). And, "courts have 'inherent power to enforce consent judgments, beyond the remedial contractual terms agreed upon by the parties [because] a consent judgment contemplates judicial interests apart from those of the litigants.'" *United States v. N.Y.C. Dist. Council of N.Y.C.*, 229 Fed. Appx. 14, 18 (2d Cir. 2007) (quoting *E.E.O.C. v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Joint Apprentice-Journeyman Educ. Fund*, 925 F.2d 588, 593 (2d Cir. 1991)). Thus, "[u]ntil the parties have 'fulfilled their express obligations' to comply with a consent decree, 'the court has continuing authority and discretion—pursuant to its independent, juridical interests—to ensure compliance.'" *Id.* at 18 n.5 (quoting *Local 580*, 925 F.2d at 593); *see also Berger*, 771 F.2d at 1568.

A court may impose sanctions for civil contempt "to coerce obedience to a court order or to compensate the complainant for losses sustained as a result of the contumacy." *Connolly v. J.T. Ventures*, 851 F.2d 930, 932 (7th Cir. 1988) (citing *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947)); *accord FTC v. Trudeau*, 579 F.3d 754, 769 (7th Cir. 2009); *see also United States v. Saccoccia*, 433 F.3d 19, 27 (1st Cir. 2005). "When the purpose of sanctions in a civil contempt proceeding is compensatory, a fine, payable to the complainant, must be based on evidence of actual loss." *S. Suburban Hous. Ctr.*, 186 F.3d 851, 854 (7th Cir. 1999) (citing *United Mine Workers*, 303 U.S. at 303-04); *see also Prima Tek II, LLC v. Klerk's Plastic Indus.*, 525 F.3d 533, 543 (7th Cir. 2008) ("…[W]e have held that remedial sanctions are limited to provable losses sustained by the non-breaching party as a result of the violation of the order.") (citing *Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 752 (7th Cir. 2007)); *Shy v. Navistar Int'l Corp.*, 701 F.3d 523, 533 (6th Cir. 2012) ("Where a consent decree is violated, the court should fashion equitable relief that is 'designed to make the party whole for his or her loss.'") (quoting *Cook*, 192 F.3d at 695).

The Seventh Circuit has consistently reiterated that "[c]ourts have broad discretion to fashion contempt remedies and the particular remedy chosen should be 'based on the nature of the harm and the probable effect of alternative sanctions.'" *Trudeau*, 579 F.3d at 771 (quoting *Connolly*, 851 F.2d 930). "When considering an appropriate sanction for a party in contempt, the guiding principle is proportionality." *APC Filtration, Inc. v. Becker*, No. 07-CV-1462, 2010 WL 4930688, at *1 (N.D. Ill. Nov. 30, 2010) (citing *Crown Life Ins. Co. v. Craig*, 995 F.2d 1376, 1382 (7th Cir. 1993)). Despite the wide latitude courts have to craft civil contempt remedies, if the contempt order's purpose is actually to "punish the contemnor, vindicate the court's authority, or deter

future misconduct," *In re Grand Jury Proceedings*, 280 F.3d 1103, 1107 (7th Cir. 2002), then the sanction is criminal and not civil. And, "the form of the sanction matters because criminal sanctions require certain constitutional safeguards before they are imposed." *Trudeau*, 579 F.3d at 769.

To succeed on a motion for civil contempt regarding a consent decree, a party must prove by clear and convincing evidence that the opposing party violated the terms of the consent decree. *See Goluba v. School Dist. of Ripon*, 45 F.3d 1035, 1037 (7th Cir. 1995); *see also Autotech*, 499 F.3d at 751; *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 460 (7th Cir.1993). Violated terms, that is, which are "clear and unambiguous." *Saccoccia*, 433 F.3d at 27; *see also Autotech*, 499 F.3d at 751 (noting that a party must demonstrate "by clear and convincing evidence that the [non-movant] has violated the *express and unequivocal command*" of an order or decree) (emphasis added). In addition, the party must also show that the violation: (1) "was significant, meaning that [the non-movant] did not substantially comply" with the consent decree; and, (2) the non-movant "failed to take steps to reasonab[ly] and diligently comply with the order." *Trudeau*, 579 F.3d at 763; *see also Prima Tek II*, 525 F.3d at 542; *Goluba*, 45 F.3d at 1037.

The numerous requirements noted above are necessary because "[t]he judicial contempt power is a potent weapon," *Int'l Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967), and "[t]he consequences that attend the violation of a court order are potentially dire," *Project B.A.S.I.C. v. Kemp*, 847 F.3d 11, 17 (1st Cir. 1991); thus, "courts must 'read court decrees to mean rather precisely what they say,'" *id.* (quoting *NBA Properties, Inc. v. Gold*, 895 F.2d 30, 32 (1st Cir. 1990)); *see also United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971) ("…[T]he scope of a

consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it."). And, to temper the "potent" contempt power even further, courts "must read any ambiguities or omissions in…a court order as redound[ing] to the benefit of the person charged with contempt." *NBA Properties*, 895 F.2d at 32.

### 2.1.2 The Government's Contempt Motion Must Be Denied[2]

The Court finds, in light of the legal requirements that must be met to sustain compensatory civil contempt sanctions, that the government's contempt motion must be denied. To begin, the government has failed to show that the defendants—by razing three of the properties without a court order (and without consent of the government)—violated the clear and unambiguous language of the Consent Decree. The government cannot point to any express language in the Consent Decree forbidding the defendants from razing properties; nor could the Court find any. As the First Circuit has stated, "if the 'clear and unambiguous' test is to have any content, it cannot be applied in the abstract"; instead, that prong "requires that the words of the court's order have clearly and unambiguously forbidden *the precise conduct on which the contempt allegation is based.*" *Saccoccia*, 433 F.3d at 28 (citing *Perez v. Danbury Hosp.*, 347 F.3d 419, 424 (2d Cir. 2003)). The closest the Consent Decree comes to addressing this conduct is in Paragraph 4, which states: "If Defendant intends to *sell or transfer* any property subject to this Consent Decree prior to [its] termination," certain requirements must be met. (Docket #6 ). That language is insufficient to cover the defendants' choice to

---

[2] The defendants' arguments in opposition to the government's motion are premised, in substantial part, on the government's lack of standing to bring the contempt motion. Given that the government is a party in this case, those arguments are without merit and will not be addressed further.

raze the properties, nor does it satisfy the government's burden to prove contempt by "clear and convincing evidence."

However, to be sure, the defendants agreed to be bound by the terms of the Consent Decree, and those terms expressly required abatement. And, "[a] defendant who has obtained the benefits of a consent decree--not the least of which is the termination of the litigation—cannot then be permitted to ignore such affirmative obligations as were imposed by the decree." *Berger*, 771 F.2d at 1568. But, on balance, the Court declines to impose civil contempt sanctions on the defendants for what is, in some respects, a technicality. And, tellingly, the government concedes as much, stating that "demolishing a property technically abates the lead-based paint hazards." (Docket #192 at 11); (*see also* Docket #194 at 6) (noting that "demolishing the properties prevented tenants in these buildings from being exposed to lead-based paint hazards").

Moreover, the Court cannot ignore the overarching intent of the Consent Decree, which was to protect the safety and welfare of current and would-be tenants of the Properties. While the defendants' conduct is not to be condoned, the Court cannot say that it did not further the overall goal of the Consent Decree. *See Goluba*, 45 F.3d at 1038 (noting that when there are ambiguities, "we 'look to the evil which the decree was designed to rectify'") (quoting *Armour*, 402 U.S. at 686 (Douglas, J., dissenting)). Nor can the Court ignore that the Consent Decree was drafted by the government and, similar to a contract, must be construed against them and not the defendants. *See Saccoccia*, 433 F.3d at 28; *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238 (1975); *see also Cook*, 192 F.3d at 695.

The government's argument that a finding of contempt is nonetheless warranted because razing "was not sanctioned by the Consent Decree" and "[d]emolition does not add to the stock of lead-safe rental housing as does the abatement of lead hazards" (Docket #192 at 11) is equally unavailing. True, razing of these properties does not add to the stock of lead-safe rental housing, but the Court agrees with the defendants that, as a general matter, "a business or private citizen of the City of Milwaukee…is not mandated or required to provide housing for anyone." (Docket #195 at 5). The government's argument is further undercut by the fact that the properties that were razed had no tenants, nor could they because the properties were placarded by the City of Milwaukee and deemed to be uninhabitable. (Docket #193 at 3).

Now, as to the defendants' decision to "perform[] abatement work on two properties subject to the Consent Decree and subsequent orders . . . without following the proscribed procedures" in the Consent Decree (Docket #192 at 10), the Court finds that the defendants have expressly violated the clear and unambiguous language of the Consent Decree. But, this contumacy is best remedied—as will be discussed further below—by ordering that the defendants permit HUD to inspect these properties (as was proposed by the government).

Turning back to the government's contempt motion writ large, even assuming, *arguendo*, that the Court were to entertain contempt sanctions to remedy the defendants' actions regarding the five properties at issue, the sanctions proposed by the government are untenable. This is because the amount requested by the government, the route it used to calculate it, and the nature of the injury the government seeks to redress, would transform the sanction into a criminal one—even if the Court intended otherwise. *See*

*Trudeau*, 579 F.3d at 769 ("In a given case, which form a sanction takes depends on the 'character of the relief itself,' and not on the 'subjective intent of…courts.'") (quoting *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828 (1994)).

The government "requests that the Court order Mr. Sherard to forfeit an amount equal to the average cost to abate lead-based paint hazards from those five properties, namely $93,025, of the funds remaining in escrow." (Docket #192 at 8). The government reached that figure by taking the "average cost of the abatement work for the properties…subject [to] the Consent Decree," $18,605, and multiplying it by five. *Id.* The government requests "that the forfeited amount be distributed to the Layton Boulevard West Neighbors (LBWN) for the purpose of abating [future] lead-based paint hazards." *Id.*[3] The government originally styled this relief as "a narrowly crafted remedy intended to dislodge any gains achieved by Mr. Sherard from his contumacious behavior." *Id.* at 11. Later, however, the government switched strategies—due to the defendants' brief, undoubtedly—and referred to the relief as necessary to remedy the "harm to the public." (Docket #194 at 6); *id.* at 7 n.1 (averring that the "harm alleged in this case was to consumers at large, and not directly to the government").

Because the government's calculations are at best hypothetical and at worst wholly speculative, some part of the award would surely be greater than necessary; the Seventh Circuit has found this improper, given that "[i]f

---

[3]The government states that "LBWN is a non-profit, community development corporation which is dedicated to revitalizing certain neighborhoods on the southside of Milwaukee.…[And,] [i]n the event…the Court should award the relief sought[,]…LBWN has agreed to establish a new grant matching program to abate lead-based pain hazards in residential properties." *Id.* at 8-9. As such, "the United States believes that it is an appropriate recipient of these funds." *Id.* at 9.

any part of [the award] winds up being punitive instead of remedial, then criminal proceedings are required to sustain it." *Trudeau*, 579 F.3d at 770 (citing *Nye v. United States*, 313 U.S. 33, 43-44 (1941)).

More fundamentally, the Court cannot square the government's request for the sanctions to be donated to LBWN with the standard for compensatory civil contempt sanctions, which seek to "compensate the complainant for losses sustained." *United Mine Workers*, 330 U.S. at 303-04; *see also Autotech*, 499 F.3d at 752. Actual losses, that is. *See S. Suburban Hous. Ctr.*, 186 F.3d at 854. The government's use of the phrases "potentially avoided," "the anticipated cost," and "gains that Sherard *may have achieved*" are insufficient to show actual loss; at best, the government has "guesstimated" what the defendants may have saved by razing the properties and remediating the lead-based paint hazards in two properties outside the terms of the Consent Decree. This does not suffice to meet the government's burden of proof. *See Autotech*, 499 F.3d at 751-52; *Trudeau*, 579 F.3d at 773 ("The [movant] bears the initial burden of establishing the baseline figure: a reasonably approximation of losses, gains, or some other measure the court finds appropriate.").

Nor is the Court persuaded that civil contempt sanctions predicated on harm to "consumers at large" or "the citizens of Milwaukee" is the "type of harm…sufficient to invoke contempt sanctions." (Docket #194 at 7). And, it appears, the government *itself* is unsure about whether such harm is sufficient, *see id.* ("The issue of whether harm to consumers is sufficient to warrant a remedy for violating the Consent Decree is not addressed by the Seventh Circuit [in *Trudeau*]. Therefore, one can infer that the court [found it sufficient]."); *id.* at 8 (noting that the cases the government cite "implicitly accept that less direct harm is appropriately remedied in the context of civil

contempt proceedings and should be considered precedent for the circumstances of this case").

It is true that in *Trudeau* and *Connolly*, the Seventh Circuit permitted civil contempt sanctions to prevent unjust enrichment. *See Trudeau*, 579 F.3d at 774 ("Courts can fashion contempt sanctions based on the defendant's unjust enrichment, even if that amount might exceed the plaintiff's loss."); *Connolly*, 851 F.2d at 932-34. And the government relies heavily on these cases, in essence analogizing the supposed money the defendants saved by razing the properties and abating outside the terms of the Consent Decree, to impermissible gains. However, *Trudeau* and *Connolly* are readily distinguishable; both cases involved defendants *selling* merchandise—books in *Trudeau* and shirts in *Connolly*—and thus civil contempt sanctions to dislodge profits from violating a consent decree barring those sales makes eminent sense. Here, however, there are no such sales and surely no profits from them. To the extent that the government is arguing that cost-savings are sufficient to warrant civil contempt sanctions, the Court declines to make that leap in logic.

As a final matter, the Court reiterates that the defendants' actions are in no way acceptable, nor condoned. Mr. Sherard knows full well what happens when a party thumbs their nose at a Court's command and chooses contumacy over compliance. That said, if any sanctions were warranted for the defendants' latest shenanigans, the Court finds that Mr. Sherard's stint in jail and having thousands of dollars tied up in escrow for multiple years, are sanction enough, for now.

## 2.2 The Defendants Must Comply With the Unmet Requirements of the Consent Decree Before the Funds in Escrow Will be Released

While the Court may have denied the government's motion for contempt, the defendants fare no better with their unfounded request to vacate the consent decree. The defendants assert that "we all can agree that the purpose of the Consent Decree was to have the lead remediated from the subject properties. That goal *and specific terms* have been met." (Docket #193 at 10) (emphasis added). Au contraire.

The defendants aver that they are entitled to relief under Federal Rule of Civil Procedure 60(b)(5)—relief in the form of vacatur of the Consent Decree—because it is no longer equitable to continue to enforce the Consent Decree. (Docket #193 at 8). But, relief under Rule 60(b)(5), as it pertains to consent decrees, requires a substantial change in circumstances, *see Rufo*, 502 U.S. at 383, given that "[a] consent decree is a judgment of the court that embodies the parties' [own] negotiated settlement of litigation." *United States v. Jupiter Aluminum Corp.*, No. 07-CV-262, 2009 WL 418091, at *4 (N.D. Ind. Feb. 18, 2009). The bar for relief under Rule 60(b)(5) is high because courts should only exercise discretion under that rule "in exceptional situations," those situations that warrant overriding the important goal that a court's judgment be final in the fullest sense of the word. *See Jupiter Aluminum*, 2009 WL 418091, at *4. This case does not represent one of those exceptional situations. At bottom, the defendants are arguing that because they have come close to meeting all of the requirements *they agreed to* and it has been nearly ten years since the Consent Decree was entered, notions of equity require termination of the Consent Decree. Stated another way, the defendants argue their efforts, while imperfect, have been "good enough."

As vexing as this case has been for all parties involved, however, compliance with the remaining requirements is necessary to ensure the safety of current and future tenants of these properties. The defendants' "good enough" argument fails because the Court will not shirk its duty to those individuals the Consent Decree was meant to protect by ignoring the *unmet* requirements of the Consent Decree. To be sure, the requirements must be met.

Paragraph 58 describes when the Consent Decree will terminate. Subsection (c) states that the defendants must "certif[y] compliance with the terms and conditions of this Consent Decree to the United States," and subsection (d) requires the United States to consent to that certification. This requirement remains *unmet*. The government proposed a document for the defendants to sign to meet this requirement, an offering the defendants rebuffed. The Court will leave it to the parties to resolve what the final wording of the certification will be. Whatever the wording, the defendants have until June 1, 2015, to file the certification required by Paragraph 58.

Paragraph 16(d) (and Paragraph 19) requires that the defendants submit an O&M plan "for those properties that are not Lead-Based Paint Free," which HUD must approve. This requirement remains unmet. The defendants allege that "[t]he O&M plan requirement was a part of the original Consent Decree but not a part of the 2009 stipulated agreement." (Docket #193 at 12). Other than this bald assertion, the defendants offer nothing to support this conclusion. Rather, the O&M plan requirement, as noted by the government, "is an important component of the Consent Decree" because it "facilitate[s] the prompt identification and remediation of any new lead-based paint hazards that develop on any of [Mr.] Sherard's properties"; this is so because these properties are categorically not lead safe because "not all the lead-based paint was removed from these properties."

(Docket #194 at 10). Thus, an O&M plan to ensure that once-remediated hazards do not return is a requirement the Court is patently unwilling to sweep under the rug. The government has provided a draft O&M plan for the defendants, (*see* Docket #192-1). Again, the final form of this plan will be up to the parties (and subject to HUD approval), but the requirement must be met. Thus, the defendants have until June 1, 2015, to implement an O&M plan as required by the Consent Decree.

The Court also agrees with the government that HUD should be given "future access to 5053 N. Elmhurst and 3249 N. 35th Street to visually inspect for lead-based paint hazards" given that the defendants did not follow the proper procedures as outlined in the Consent Decree. *Id.* at 16. If, as the defendants assert, the lead-based paint hazards were remediated properly, this requirement should be *de minimis*. If not, then the requirement will only be as onerous as the defendant's remediation work has been improper. The defendants have until June 1, 2015, to file a document indicating their consent to this requirement.

Complying with the requirements noted above should not be overly difficult for the defendants, given that the government has already provided the defendants with a de facto roadmap. Accordingly, the Court will not tolerate further disagreements or quibbling about the remaining requirements that must be met. Should the defendants fail to meet the June 1, 2015 deadline imposed by the Court (for all remaining requirements), the Court will award stipulated penalties as outlined in the Consent Decree. (Docket #6 at 16). Namely, "$200 per day per violation per each unit," *id.*, until all requirements have been met in full.

3.   CONCLUSION

As outlined above, the Court is obliged to deny the government's motion for contempt. Rather, as the Court has noted, the defendants shall accept the "olive branch" the government has extended, given that the requirements in the Consent Decree that remain to be satisfied are just those requirements the government proposed as an alternate resolution to its motion for contempt. (*See* Docket #192). The defendants have until June 1, 2015, to meet those requirements, or the defendants' remaining funds in escrow will be reduced by the penalties noted above; any amount will be payable to the United States, as required by the terms of the Consent Decree. (Docket #6 at 16). Until these requirements are met, the Consent Decree will remain in place. As soon as all of the requirements are satisfied, however, the Court expects a joint motion to terminate the Consent Decree and release the remaining funds in escrow to the defendants.

Finally, one housekeeping matter must be addressed. The Court notes that there is also the remaining issue of the third-party clearance exams filed by the defendants that failed to "technically comply with the HUD Guidelines, as required by Paragraph 17(f) of the Consent Decree." (Docket #192 at 12). The Court agrees with the government that, given the requirement that the defendants implement an O&M plan, and considering that the properties were previously tested and cleared by the City of Milwaukee Health Department, this minor failing need not give the Court pause, so long as the defendants meet all of the remaining requirements. (*See id.*) (noting that the "United States [also] does not object to the deficiencies in these reports"). Consequently, the Court will not order any further clearance exams, despite these deficiencies.

Accordingly,

IT IS ORDERED that the government's motion for contempt (Docket #142) be and the same is hereby DENIED; and

IT IS FURTHER ORDERED that the defendants shall have until June 1, 2015, to satisfy the unmet requirements of the Consent Decree, as outlined above. Failure to do so by June 1, 2015, will result in stipulated penalties of "$200 per day per violation per each unit," (Docket #6 at 16), until those requirements are met in full.

Dated at Milwaukee, Wisconsin, this 22nd day of April, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge